# ADMINISTRATIVE SERVICES AGREEMENT

This Administrative Services Agreement ("Agreement") between United HealthCare Insurance Company ("Our," "Us," or "We" in this Agreement) and BBA Aviation Benefit Plan ("You" or "Your" in this Agreement) is effective July 1, 2001 ("Effective Date"). This Agreement covers the services we are providing to you for use with your self-funded employee benefit plan.

This Agreement is structured so that the General Provisions appear first and the related Exhibits follow. The Agreement consists of this page, the main body following this page, and the Exhibits.

United HealthCare Insurance Company identifies this arrangement as Contract No.: 237592.

By signing below, each party agrees to the terms of this Agreement.

**United HealthCare Insurance Company**
**450 Columbus Blvd.**
**Hartford, CT 06115-0450**

By _____

Authorized Signature

Print Name    Diana Baker

Print Title    Policy Registrar

Date    Feb. 18, 2002

**BBA Aviation Benefit Plan**
**900 Nolen Drive**
**Grapevine, Texas 76051**

By _____

Authorized Signature

Print Name    DENNIS B SMITH

Print Title    VP HUMAN RESOURCES

Date    5/7/02

ASA98 (4/01)

**BBA 00435**

EXHIBIT ___A___
PAGE ___1___ of __21__

# Table of Contents

Section 1  -  Definitions ................................................................. 1

Section 2  -  Employee Benefit Plan ....................................................... 1

Section 3  -  Records, Information, Audits ................................................. 2

Section 4  -  Indemnification ............................................................. 3

Section 5  -  Plan Benefits Litigation .................................................... 3

Section 6  -  Taxes And Assessments ....................................................... 3

Section 7  -  Your Other Responsibilities ................................................. 4

Section 8  -  Service Fees ................................................................ 4

Section 9  -  Term Of The Agreement ....................................................... 5

Section 10  -  Termination Of The Agreement ............................................... 5

Section 11  -  Mediation .................................................................. 5

Section 12  -  Services Provisions ........................................................ 6

Section 13  -  Miscellaneous .............................................................. 12

EXHIBIT A  -  SERVICE FEES ................................................................ 13

EXHIBIT B  -  PERFORMANCE STANDARDS FOR HEALTH BENEFITS ................... 14

EXHIBIT C  -  THIRD PARTY DISCLOSURE AGREEMENT ......................... 18

BBA 00436

# Section 1 - Definitions

When these terms are used in the Agreement they have the meanings shown. The words may or may not be capitalized and may be singular or plural.

**Affiliated Employer:** An entity that is affiliated with you and whose employees or former employees are covered by the Plan. This term is more specifically defined in Section 2.6.

**Agreement Period:** Period of twelve (12) months commencing on the Effective Date and automatically continuing for additional 12-month periods until the Agreement is terminated.

**Bank:** Chase Bank, New York, New York.

**Bank Account:** Bank Account maintained for the payment of Plan benefits, expenses, and fees.

**Confidential Participant Information:** Information that contains personally identifiable health information about a Participant.

**Employee:** A current or former employee of you or an Affiliated Employer.

**ERISA:** Employee Retirement Income Security Act of 1974 as amended from time to time.

**Managed Care Network:** Network of Network Providers who have entered into or are governed by contractual arrangements under which they agree to provide health care services to Participants and accept negotiated fees for these services.

**Network Pharmacy:** Pharmacy which has entered into an agreement with us or our affiliate or subcontractor to provide prescription drug services to Participants.

**Network Provider:** Health care provider who participates in one of our Managed Care Networks.

**Overpayments:** Payments that exceed the amount payable under the Plan (for example, because of a provider billing error, retroactive or inaccurate eligibility information, coordination of benefits, Medicare disputes, or missing information), and other overcharges made by providers, including hospitals discovered during the course of a hospital bill audit.

**Participant:** Employee or dependent who is covered by the Plan.

**Plan:** The ERISA Plan to which this Agreement applies, but only with respect to those provisions of the Plan relating to the self-funded health benefits we are administering, as described in the Summary Plan Description.

**Plan Administrator:** "Administrator" or "Plan Administrator" as these terms are defined under ERISA and shall refer to the current or succeeding person, committee, partnership, or other entity designated as such by the terms of the instrument under which the Plan is operated, or by law.

**Proprietary Business Information:** Information about your business or our business that is confidential, proprietary, trade secret or is not readily available to the general public; or, information that has been designated by you or us as confidential or proprietary.

**Self-Fund or Self-Funded:** Means that you have the sole responsibility to pay, and provide funds, for all Plan benefits. We have no liability to provide these funds. This is true even if we provide stop loss insurance to you.

**Summary Plan Description:** Document(s) provided to Participants describing the terms and conditions of coverage offered under the Plan.

**Tax or Taxes:** Taxes, assessments and all other federal, state, local or other governmental charges.

## Section 2 - Employee Benefit Plan

**Section 2.1  The Plan.** The Plan to which this Agreement applies is the BBA Aviation Benefit Plan (Welfare Benefit Plan).

1

**Section 2.2  Responsibility for the Plan.**  Except to the extent this Agreement specifically requires us to have the fiduciary responsibility for a Plan administrative function, you accept total responsibility for the Plan for purposes of this Agreement including its benefit design and compliance with any laws that apply to you or the Plan, whether or not you or someone you designate is the Plan Administrator. We are not the Plan Administrator of the Plan.

**Section 2.3  Description of the Plan.**  You will give us a written description of the Plan benefits and Plan provisions in a timely manner, so that we will be able to provide our services under this Agreement on the Effective Date.

**Section 2.4  Plan Consistent with the Agreement.**  You represent that Plan documents, including the Summary Plan Description, are consistent with this Agreement. You will provide us with copies of Plan documents and employee communications prior to distributing these materials to employees or third parties. You will amend them if we determine that references to us are not acceptable, or any Plan provision is not consistent with this Agreement or the services that we are providing.

**Section 2.5  Plan Changes.**  You will notify us in writing if you change the Plan's benefits or other relevant Plan provisions, including termination of the Plan, within a reasonable period of time prior to the change becoming effective. We can decide when changes can be made. We can decide whether or not we will continue providing our services as a result of those changes. We have the option of giving you thirty (30) days written notice of termination of this Agreement following our receipt of your notice of the change. If we decide to continue providing our services, you will pay us for any reasonable costs that we incur, to put the Plan changes in place. In addition, the fees you are required to pay under this Agreement may be changed by us in accordance with Section 8 of this Agreement.

**Section 2.6  Affiliated Employers.**  You will provide us with a list of your Affiliated Employers prior to the Effective Date. You will provide prior written notice of any changes to this list. You represent that together you and the Affiliated Employers make up a single "control group" as defined by ERISA.

## Section 3  -  Records, Information, Audits

**Section 3.1  Records.**  We will keep records relating to the services we provide under this Agreement for as long as we are required to do so by law.

**Section 3.2  Access to Information.**  If you need information, for an audit or otherwise, that we have in our possession in order to administer the Plan, we will give you access to that information, if legally permissible, as long as the information relates to our services under this Agreement, and you give us (60) sixty days prior notice of the need for the information.

You must also represent that you have a reasonable procedure in place for handling Confidential Participant Information as required by any then current law.

We will provide information only while this Agreement is in effect and for a period of three (3) months after the Agreement terminates, unless you demonstrate that the information is required by law for Plan purposes.

We will also provide reasonable access to information to an entity providing services to you, such as an auditor or other consultant, if you request it. Before we will give access to Confidential Participant Information to that entity, that entity must sign our "Third Party Disclosure Agreement", a specimen of which is attached to this Agreement as Exhibit C.

**Section 3.3  Audits.**  During the term of the Agreement, and at any time within six (6) months following its termination, you or a mutually agreeable entity may audit us to determine whether we are fulfilling the terms of this Agreement. You must advise us at least sixty (60) days in advance of your intent to audit. The place, time, type, duration, and frequency of all audits must be reasonable and agreed to by us. All audits shall be limited to information relating to the calendar year in which the audit is conducted and/or the immediately preceding calendar year. With respect to our transaction processing services, the audit scope and methodology shall be consistent with generally acceptable auditing standards, including a statistically valid random sample or other acceptable audit technique as approved by us ("Scope").

You will pay any expenses that you incur, and will be charged an additional fee, determined by us, for more than one audit every twelve (12) months, for any on-site audit visit that is not completed within five (5) business days, or for sample sizes exceeding the Scope set forth above. You will incur a per claim charge for

2

BBA 00438

samples in excess of the Scope; and a $1000 charge for each day an audit exceeds the five (5) day on-site review limit per year. The additional fees cover the additional resources, facility fees, and other incremental costs associated with an audit that exceeds the Scope. You will also pay any unanticipated expenses we incur and all expenses incurred by us on any audit initiated after this Agreement is discontinued.

You will provide us with a copy of any audit reports.

**Section 3.4  Confidential Participant Information.**  Confidential Participant Information will be used solely to administer the Plan or to perform under this Agreement. Confidential Participant Information will not be disclosed to any person or entity other than either party's employees, subcontractors, or representatives needing access to the Confidential Participant Information to administer the Plan or perform under this Agreement.

We or a related entity may use Confidential Participant Information for research, creating comparative databases, statistical analysis, or other studies. We will maintain the confidentiality of such information as it relates to any individual Participant, provider, or your business. The research, databases, analyses, and studies are considered by us to be Proprietary Business Information.

## Section 4  -  Indemnification

**Section 4.1  You Indemnify Us.**  You will indemnify us and hold us harmless against any and all losses, liabilities, penalties, fines, costs, damages, and expenses, we incur, including reasonable attorneys' fees, except where there has been a finding of gross negligence or willful misconduct in the performance of our obligations under this Agreement or where there has been material breach of this Agreement by us, as determined by a court or other tribunal having jurisdiction of the matter.

**Section 4.2  We Indemnify You.**  We will indemnify you and hold you harmless against any and all losses, liabilities, penalties, fines, costs, damages, and expenses, that you incur, including reasonable attorneys' fees, which arise out of our gross negligence or willful misconduct in the performance of our obligations under this Agreement or our material breach of this Agreement, as determined by a court or other tribunal having jurisdiction of the matter.

## Section 5  -  Plan Benefits Litigation

**Section 5.1  Litigation Against Us.**  If a demand is asserted or litigation or administrative proceedings are commenced by a Participant or health care provider against us, or against the Plan and us jointly, to recover Plan benefits, related to our duties under this Agreement ("Plan Benefits Litigation"), we will select and retain defense counsel to represent our interest. In actions asserted against both you and us, and provided no conflict of interest arises between the parties, we will agree to joint defense counsel. All legal fees and costs we incur in defense of the litigation will be paid by you, except as provided in Section 4.2. The failure to seek payment of our legal fees and costs does not relieve you of your obligation to indemnify us for other amounts as provided in Section 4.1. The failure to provide notice of Plan Benefits Litigation does not relieve you of your obligation to pay our legal fees and costs. Both parties will cooperate fully with each other in the defense of the Plan Benefits Litigation. We will have discretion to resolve Plan Benefits Litigation at your expense in a reasonable manner and for a reasonable amount under the circumstances.

In all events, you are responsible for the full amount of any Plan benefits paid as a result of such litigation.

**Section 5.2  Litigation Against You.**  If litigation or administrative proceedings are commenced against you and/or the Plan, you will select and retain counsel and you will be responsible for all legal fees and costs in connection with such litigation. We will cooperate fully in the defense of litigation arising out of matters relating to this Agreement.

## Section 6  -  Taxes And Assessments

**Section 6.1  Payment of Taxes and Expenses.**  You will reimburse us for Taxes that are assessed against us or that we are required to pay, now or in the future, relating to: (1) the Plan; (2) taxes relating to benefit payments under the Plan; (3) this Agreement; or (4) our fees or services under this Agreement (but not Taxes on our net income). We have the authority and discretion to determine whether any such Tax should be paid or disputed. We will act reasonably in making that determination. You will also reimburse us for a

3

proportionate share of any cost or expense reasonably incurred by us relating to such Tax, including costs and reasonable attorneys' fees incurred in disputing such Tax, and any interest, fines, or penalties relating to such Tax.

**Section 6.2  Tax Reporting.**  In the event that the reimbursement of any benefits to Participants in connection with this Agreement is subject to tax reporting requirements, you are responsible for complying with these requirements.

## Section 7  -  Your Other Responsibilities

**Section 7.1  Eligibility Information.**  You will tell us which of your employees, their dependents and/or other persons who are eligible to be Participants. This information must be accurate and provided to us in an agreed to format. You will notify us promptly of any changes.

We shall be entitled to rely on the most current information in our possession regarding eligibility of Participants in paying Plan benefits and providing other services under this Agreement. We shall not be required to make retroactive changes in regard to claims for Plan benefits incurred on dates more than 60 days before the date on which corrected information was provided to us.

**Section 7.2  Notices to Participants.**  You will give Participants the information and documents they need to obtain benefits under the Plan within a reasonable period of time before coverage begins. In the event of this Agreement's discontinuance, you will notify all Participants of the discontinuance of the services we are providing under this Agreement.

**Section 7.3  Financial Information.**  At our request you will provide us with the financial information about you that we need to determine if you can meet your financial obligations under this Agreement.

## Section 8  -  Service Fees

**Section 8.1  Service Fees.**  You will pay us fees for our services. The service fees listed in Exhibit A of this Agreement are effective for the Agreement Period shown in the Exhibit. In addition to the service fees specified in Exhibit A, you must also pay us any additional fee that is authorized by a provision elsewhere in this Agreement or is otherwise agreed to by the parties.

**Section 8.2  Changes in Service Fees.**  We can change the service fees: (1) on each Agreement Period anniversary; (2) any time there are changes made to this Agreement or the Plan, which affect the fees; (3) when there are changes in laws or regulations which affect the services we are providing, or will be required to provide, under this Agreement; or (4) if the number of employees covered by the Plan or any option of the Plan changes by ten percent (10%) or more (e.g., when Participants change from an indemnity plan to a plan with a network differential). Any new service fee which arises out of such change will be effective on the date those changes occur, even if that date is retroactive.

We shall, however, provide you with thirty (30) days prior written notice of the revised service fees for subsequent Agreement Periods, item (1) above. Service fee adjustments relating to an Agreement Period anniversary shall become effective on the later of the first day of the new Agreement Period or thirty (30) days after we provide you with written notice of the new fees.

If you do not agree to the new service fees, you may terminate this Agreement upon thirty (30) days written notice after you receive written notice of the new fees. You must still pay any amounts due for the periods during which the Agreement is not terminated.

**Section 8.3  Due Dates, Payments, and Penalties.**  In some cases, we will bill you for the amounts that you owe us. In those cases, the amounts owed are due and payable on the Due Date/Statement Date shown on the bill. In other cases, we will provide you with statements in advance that you complete and send to us. In those cases, the Due Date for these amounts is on the first day of each calendar month. If amounts owed are not paid within fifteen (15) days after their Due Date/Statement Date, you will pay us interest on these amounts at the interest rate that we charge to our self-funded customers. You agree to reimburse us for any costs that we incur to collect these amounts.

4

BBA 00440

**Section 8.4  Reconciliation.**  For each Agreement Period, we will reconcile the total amounts you paid with the total amounts you owed. If the reconciliation indicates that we owe you money, your next payment will be credited. If the reconciliation indicates that you owe us money, you will pay us within fifteen (15) days after receiving notice of the amounts that you owe us.

If the Agreement is terminated, then we will pay you the amount owed within fifteen (15) days after we perform a final reconciliation. If the final reconciliation indicates that you owe us money, you will pay us within fifteen (15) days after receiving notice of the amount owed.

For payments you make after fifteen (15) days of receiving notice of the amounts that you owe us, we will charge interest at the interest rate that we charge to our self-funded customers.

## Section 9  -  Term Of The Agreement

**Section 9.1  Services Begin.**  We will begin providing you services under this Agreement on the Effective Date. Our services apply only to claims for Plan benefits that are incurred on or after July 1, 2001.

This Agreement will apply for an initial Agreement Period commencing on the Effective Date and will automatically continue for additional Agreement Periods, unless and until this Agreement is terminated.

**Section 9.2  Services End.**  Our services under this Agreement stop on the date this Agreement terminates, regardless of the date that claims are incurred. However, we may agree to continue providing certain services beyond the termination date.

## Section 10  -  Termination Of The Agreement

**Section 10.1  Termination Events.**  This Agreement will terminate when: (1) The Plan terminates. (2) Both parties agree to terminate the Agreement. (3) After the initial Agreement Period, either party gives the other party at least thirty (30) days prior written notice. (4) We give you notice of termination because you did not pay the fees or other amounts you owed us under this Agreement. (5) You fail to provide the required funds for payment of benefits. (6) Either party is in material breach of this Agreement, other than by non-payment or late payment by you of fees owed, and does not correct the breach within thirty (30) days after being notified in writing by the other party. (7) Any state or other jurisdiction penalizes a party for administering the Plan under the terms of this Agreement. In this situation, the party may immediately discontinue the Agreement's application in such state or jurisdiction. Notice must be given to the other party when reasonably practical. The Agreement will continue to apply in all other states or jurisdictions. (8) There may be other places in this Agreement authorizing you or us to terminate the Agreement.

**Section 10.2  Run-Out Administration.**  We will provide claim processing services for a period of three (3) months following the Agreement's termination on claims for health services incurred prior to the termination of the Agreement Period. All of the other terms of this Agreement will apply to these post-termination services. We will not provide these services after the Agreement's termination if the Agreement was terminated because you failed to pay us fees due, or, you did not provide the funding required under Section 12.3, or, when there is termination for any other material breach. The fee for run-out services is included in the administration fees set forth in Exhibit A.

When this Agreement terminates, the method of providing funds for Plan benefits remains in place for a limited period of time. At the end of this period, we will place stop payments, at your expense, on all checks that remain uncashed.

## Section 11  -  Mediation

In the event that any dispute, claim, or controversy of any kind or nature relating to this Agreement arises between the parties, the parties agree to meet and make a good faith effort to resolve the dispute. If the dispute is not resolved within thirty (30) days after the parties first met to discuss it, and either party wishes to pursue the dispute further, that party shall refer the dispute to non-binding mediation under the Commercial Mediation Rules of the American Arbitration Association ("AAA"). In no event may the mediation be initiated more than one year after the date one party first gave written notice of the dispute to the other party.

5

BBA 00441

A single mediator engaged in the practice of law, who is knowledgeable about ERISA and employee benefit plan administration, shall conduct the mediation under the then current rules of the AAA. The mediation shall be held in Hartford, Connecticut or a mutually agreeable site.

## Section 12 - Services Provisions

**Section 12.1  Claims Processing.**  Claims for Plan benefits must be submitted in a form that is satisfactory to us. We will determine whether a benefit is payable under the Plan's provisions.

In applying the Plan's provisions, we will use claim procedures and standards that we develop for benefit claim determination. You delegate to us the discretion and authority to use such procedures and standards.

The rate of accuracy of benefit payments shall be consistent with the accuracy rate that a reasonably prudent claims administrator would be expected to achieve under similar circumstances.

Plan benefits for health care services rendered by Network Providers will be equal to the amounts the Network Providers agreed to accept in the contractual arrangements governing their participation in the Managed Care Network. These amounts could be traditional fees for services, capitated rates, or some other kind of fee or rate. A capitated rate is an amount paid to a health care provider on a per participant per month basis or a similar arrangement.

**Section 12.2  Benefit Determination and Appeals.**  You appoint us a named, ERISA fiduciary with respect to (i) performing claim processing and payment, (ii) performing the fair and impartial review of initial claim determinations, and (iii) performing the fair and impartial review of initial appeals. With respect to these functions, you delegate to us the discretionary authority to (i) construe and interpret the terms of the Plan, and (ii) determine the validity of charges submitted to us under the Plan. This delegation is subject to your retention of full responsibility as Plan Administrator for the final review of denied claims, and you have the discretionary authority to construe and interpret the terms of the Plan and to make final, binding determinations concerning the availability of Plan benefits.

If it is determined that a benefit is payable, we will issue a check for, or otherwise credit, the benefit payment to the appropriate payee. If we determine that all or a part of the benefit is not payable under the Plan, we will notify the claimant of the denial and of the claimant's right to appeal the denial. This notification will be designed to comply with the ERISA requirements for claim denial notices.

If we deny a Plan benefit claim, the claimant shall have the appeal rights set forth in the Summary Plan Description, and/or which are required under applicable law. We will process the appeal and determine whether a Plan benefit is available.

If, after the exhaustion of all levels of appeal with us we determine that the Plan benefit is still not available, we will notify the claimant of the denial has been upheld and of their right to further appeal the denial to you for a full and fair review which will be final and binding. This notice will be designed to comply with the applicable ERISA requirements for claim denial notices.

You will review the appeal and determine whether the Plan benefit is payable. If, after the review, you determine that the Plan benefit is payable, you will notify us and the claimant. If, after the review, you determine that the Plan benefit is still not payable, you will notify us and the claimant of the denial. This notice will be designed to comply with the ERISA requirements for final claim denial notices. Your determination will be final and binding on the claimant and all other interested parties.

**Section 12.4  Providing Funds for Benefits.**  The Plan is Self-Funded. You are solely responsible for providing funds for payment for all Plan benefits payable to Network Providers or non-Network Providers. **Bank Account.**  You will open and maintain a Bank Account at the Bank for purposes of providing us a means to access your funds for payment of Plan benefits and expenses. The Bank Account will be a part of the network of accounts that have been established at the Bank for our self-funded customers. However, the Bank Account will belong to you and the funds in it are yours.

**Balance In Account.**  You will maintain a balance in the Bank Account in an amount equal to not less than 5 days of expected Plan benefits other than prescription drug benefits plus one-tenth (1/10th) of the amount of prescription drug benefits expected to be paid during a one-year period. We will determine this amount and notify you if and when the required amount changes.

BBA 00442

**Issuing and Providing Funds for Checks.**  The checks we write and issue to pay Plan benefits under this Agreement will be written on one or more common accounts that are a part of the network of accounts maintained at the Bank for our self-funded customers. When the checks for Plan benefits are presented to the Bank, the Bank will notify us and we will direct the Bank to accept or reject the checks. Then the Bank will withdraw funds from your Bank Account to fund the checks that are cashed.

**Transfers of Funds.**  Funds will also be withdrawn from your Bank Account when a transfer of funds we have made to pay Plan benefits is made by the Bank. For example, when a wire transfer has been made to a health care provider to pay benefits under the Plan.

**Service Fees and Other Expenses.**  Funds will also be withdrawn from your Bank Account on the due date of any service fees which you have authorized to be paid to us and for the payment of other Plan expenses from your Bank Account.

**Calls for Funds.**  The withdrawals for Plan benefits and service fees are paid for by the balance you maintain in the Bank Account.

Every 5 business day(s), you will transfer to the Bank Account the amount of funds which have been withdrawn from your Bank Account over the past 5 business day(s). You will transfer that amount using a method agreed upon by you, us and the Bank. This transfer will replenish the balance you are maintaining in the Bank Account.

If you or the Plan has obtained a stop loss policy from us or one of our subcontractors, any proceeds payable under the policy will be taken into consideration when determining the amount of funds you are required to deposit in the Bank Account.

**Underfunding.**  If you do not provide the required amounts for the balance in your Bank Account or for the funds that have been withdrawn from the Bank Account: (1) We will provide you notice, so that you can correct the problem. (2) We may stop issuing checks and suspend any of our other services under this Agreement for the period of time you do not provide the required payment. (3) We can also elect to terminate this Agreement effective as of any date after three (3) business days after we have given you notice of the payment deficiency, if you do not provide the required payment within the three (3) business days. The notice provisions contained in Termination Events, Section 10.1, do not apply to this breach. We may also place stop payments on checks, at your expense, if we determine that you do not have enough funds in the Bank Account to pay the checks that have been issued but not yet cashed. You will pay interest on the amount of underfunding at the standard rate that we charge to our self-funded customers for underfunding of bank accounts.

**Outstanding Checks.**  We will place stop payments, at your expense, on all checks we have issued under this Agreement if they have not been cashed within a certain period. This period will be reasonable, determined by us, and applied on a consistent basis to our self-funded customers.

**Termination of Agreement.**  When this Agreement terminates, the method of providing funds for Plan benefits remains in place for a limited period of time. After this period is over, that method of funding will cease and, instead, you will deposit and maintain in the Bank Account enough funds to cover all checks for Plan benefits that have been issued but not cashed. This balance will remain in the Bank Account for a limited period of time in order to fund the outstanding checks. This period will be reasonable, determined by us, and applied on a consistent basis to our self-funded customers. At the end of this period, we will place stop payments, at your expense, on all checks that remain uncashed, and you will close your Bank Account and recover any funds remaining in it. We will provide bank account statements and bank reconciliation reports, including reports you need for the purposes of escheatment.

**Section 12.5  Managed Care Network Services.**  We will make available to Participants a Managed Care Network, located in agreed to geographical sites with Network Providers who render health care and/or mental health and substance abuse care. We will provide you with directories of Network Providers, and with periodic updates and/or telephonic access to the information in the directories.

The make-up of the Managed Care Network can change at any time. Notice will be given in advance or as soon as reasonably possible.

We will maintain a grievance process so that Participants may obtain assistance with, and express their opinions about, their use of the Managed Care Network.

7

BBA 00443

We do not employ Network Providers and they are not our agents or partners. Network Providers participate in Managed Care Networks only as independent contractors. Network Providers and the Participants are solely responsible for any health care services rendered to Participants.

**Section 12.6  Medical Management Services.**  We shall provide our care coordination services in accordance with the provisions contained in this section. The care coordination program focuses on offering education, accelerating access to care and providing surveillance and monitoring of chronic conditions. These services include the review of Participants' diagnosis and proposed health care treatments with respect to whether or not the service is appropriate to treat the condition. The services are designed to facilitate member education, identify and prevent delays in treatments, and provide intervention with respect to Participants' health care needs that are highly likely to drive utilization and medical expenses of the Plan. We will review health care services and supplies to determine whether they are covered services under the Plan. If we determine that services or supplies are not covered under the Plan, then we will provide the appeal services outlined in Section 12.2 of the Agreement.

**Section 12.7  Additional Medical Management Services.**

a.    **Case Management Services.**  We may provide, when appropriate for the individual Participant, certain case management services, which are designed to provide a proactive, systematic process of coordination of health care services, including the evaluation of inpatient, outpatient and ancillary services, member education, the review of the short term outpatient care needs and where appropriate, coordination and facilitation of discharge planning needs. These services address the unmet health care needs of Participants who are not eligible for a disease management program under the Plan but are at significant risk for declining health status and high medical expenses.

We also provide an Alternative Benefit Program (ABP) of benefit coverage for health care services. This ABP program is designed by us for the diagnosis and/or treatment of a particular Participant's illness or injury with appropriate and cost effective health care services and supplies alternatives that would otherwise not be covered by the Plan. The Plan will pay for and cover as Plan benefits the health care services and supplies contained in the ABP program. You consent to our use and administration of the ABP program and delegate to us the discretion and authority to develop and revise ABPs.

We will work with Participants who satisfy the criteria for participation in case management services to develop a program of benefit coverage with appropriate and cost-effective heath care services and supplies for the diagnosis and/or treatment of the Participant's condition. If the Participants and health care provider are not willing to participate in the process, we will not provide these services.

b.    **Transplant Benefit Management Program.**

We will provide access to our network of transplant facilities and corresponding discounts for all Participants who are authorized to receive a qualified procedure by a transplant facility in accordance with the facility's guidelines for transplantation services.

We will determine what procedures will be considered qualified procedures, and provide you with a list. This list of qualified procedures can be changed at any time. We will provide you with written notice of any changes. You agree to amend the Plan consistent with the changes within a reasonable period after notice is given.

If a transplant facility determines that the Participant does not meet all of its acceptance criteria, we will make a reasonable effort to locate an appropriate alternate facility.

Services and supplies from a transplant facility for qualified procedures include: the evaluation of the Participant for the procedure; hospital and physician fees; organ acquisition and procurement; transplant procedures; follow-up care for a period up to one year after the transplant; and search for bone marrow/ stem cell from a donor who is not biologically related to the patient.

You agree that the Plan will pay for and cover as Plan benefits the services and supplies rendered to Participants for a qualified procedure in accordance with the Transplant Benefit Management Program. You delegate to us the discretion and authority to approve for payment under the Plan those services and supplies rendered to Participants for qualified procedures.

8

BBA 00444

(U) 24-04: 2:44PM:Contract Pay Account                    :800 702 7836        # 12/ 22

If the Participant chooses not to receive his or her care in connection with a qualified procedure pursuant to the Transplant Benefit Management Program, the services and supplies received by the Participant in connection with that qualified procedure will be paid under the Plan if and to the extent covered by the Plan, without regard to the Transplant Benefit Management Program.

**Section 12.8  Claim Recovery Services.**  We will provide recovery services for Overpayments. We will reimburse you for, and you will not be responsible for, recovery costs associated with any Overpayments made by us due to our gross negligence as determined by a court or other tribunal.

We will provide services to recover Plan benefits that were paid and are recoverable by the Plan because payment was or should have been made by a third party (other than in connection with coordination of benefits, Medicare, or other Overpayments) for the same medical expense. This is referred to as "Third Party Liability Recovery" (also commonly known as "subrogation"). Some examples of third parties who are legally responsible for the payment of a health claim include tort feasors, individuals involved in an accident, liability insurance carriers, automobile insurance carriers, premises medical insurance or worker's compensation carriers.

You will be charged fees when any of the services described in this section are provided by us through a subcontractor. The fees are deducted from the actual recoveries. You will be credited with the net amount of the recovery. We will provide you with a written notice of the basis of the fees for which you are charged; and, advance notice of any material changes in such fees or our recovery services.

You delegate to us the discretion and authority to develop and use standards and procedures for any recovery under this section, including but not limited to, whether or not to seek recovery, what steps to take if we decide to seek recovery, and under what circumstances to compromise a claim or settle for less than the full amount of the claim. You recognize that use of these standards and procedures may not result in recovery or in full recovery for any particular case. We will not pursue any recovery if any applicable law does not permit it, or, if recovery would be impractical. We may choose to initiate litigation to recover payments, but we have no obligation to pursue litigation. If we initiate litigation, you will cooperate with us in the litigation.

If this Agreement terminates, or, if our recovery services terminate, we can continue to recover any payments we are in the process of recovering. The appropriate fees will continue to be deducted from the actual recovery, when and if a recovery is obtained.

You will not engage any entity except us to provide these recovery services without our prior approval.

**Section 12.9  Abuse and Fraud Management.**  We will provide services related to the detection and prevention of abusive and fraudulent claims. In combination with Claim Recovery Services above, we will also provide claim recovery services.

Our Abuse and Fraud Management processes will be based upon proprietary and confidential procedures, modes of analysis and investigations we develop.

We will use these procedures and standards in delivering Abuse and Fraud Management services to you and our other customers. These procedures and standards include, but are not limited to: whether or not to seek recovery, what steps to take if we decide to seek recovery, and under what circumstances to compromise a claim or settle for less than the full amount. You delegate to us the discretion and authority to use such procedures and standards, including the authority to undertake actions, including legal actions, which have the largest impact for the largest number of customers.

You recognize that the use of these procedures and standards may not result in recovery or in full recovery for any particular case. We do not guarantee or warranty any particular level of prevention, detection, or recovery. We agree to perform Abuse and Fraud Management services pursuant to the industry standards for such services.

Fees apply for abuse and fraud recoveries, and are equal to our recovery costs and will be deducted from the actual recoveries. If this Agreement terminates, or if our claim recovery services terminate, we can elect to continue abuse and fraud recoveries. The contingency fees will continue to apply.

**Section 12.10  Claims by Other Parties.**  If there is any claim that we are an entity responsible for paying benefits or making any payment on behalf of the Plan or a Participant to another health benefits plan, or to any other person or entity, including but not limited to a claim based upon the federal Medicare Secondary Payer laws, you shall indemnify and hold us harmless with respect to such a claim and all costs associated

9

with the claim. You shall cooperate with us as necessary and appropriate to facilitate timely payment. Where necessary or appropriate you will administer and pay such claims. When such claims involve taxes, assessments or other governmental charges, the claims shall also be subject to Section 6 of this Agreement.

**Section 12.11   Escheat.**   You are solely responsible for complying with all abandoned property or escheat laws, and for making any required payments and for filing any required reports, to the extent they may be applicable.

**Section 12.12   Assistance with General Plan Administration.**   We will provide administrative services including: (a) our employer administration kit; (b) administration forms and service orientation; (c) a toll-free customer service telephone line for Participants; (d) enrollment support; and (e) identification cards for Participants. Custom services, such as special forms or administrative support that exceeds the level standardly offered to our self-funded customers will be subject to an additional fee determined by us.

We will also provide you with the standard reports that we provide to our self-funded customers. Additional reports will be provided as agreed to by the parties. An additional cost may apply.

You may request that we provide services in addition to those set forth in this Agreement. If we agree to provide them, those services will be governed by the terms of this Agreement, unless otherwise specified in an amendment to this Agreement. You will pay an additional fee, determined by us, for those services.

**Section 12.13   Summary Plan Description.**   In conjunction with your request for the development of the Summary Plan Description, we will prepare draft language in English; print booklets in our standard size and with our standard cover in a quantity equal to 110% of the number of employees; and ship printed booklets to a single location.

You will furnish additional Summary Plan Description information as may be required under ERISA and other applicable laws. We will include that information in the Summary Plan Description booklet. You will be responsible for the legal sufficiency of the Summary Plan Description, including any legally required information.

**Section 12.14   Health Insurance Portability and Accountability Act of 1996.**   We will produce Certification of Coverage forms for Participants who have lost or lose coverage under the Plan on or after the Effective Date of this Agreement, as required by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), based on eligibility and termination data that you have provided or will provide us in accordance with our data specifications. The Certification of Coverage forms will only include periods of coverage that we administer under the Plan.

The Certification of Coverage forms will only include and be based on data that is currently indicated and available to us in our eligibility systems as of the date that the form is generated. We will give you reasonable advance notice of all additional data requirements that we will need to complete the forms and you agree to provide us with that information on a timely basis.

We reserve the right to discontinue providing this service if you do not provide the required data we request in a timely manner.

**Section 12.15   Pharmacy Benefit Management Services.**   We will determine which pharmacies will be Network Pharmacies. The particular pharmacies that are Network Pharmacies can change at any time. We will make reasonable efforts to provide you with advance notice of any material changes in the network of Network Pharmacies.

If we furnish a preferred drug list, also known as a drug formulary, for use with the Plan, you agree not to copy, distribute, sell, or otherwise provide the preferred drug list to another party without our prior written approval. On termination of this Agreement, you will cease all use of the preferred drug list.

We will process the claims of Network Pharmacies in accordance with the Summary Plan Description and the Network Pharmacy's participation agreement.

**Rebate Program.**   You will comply with the requirements of the rebate program under which we have access to rebates payable by pharmaceutical manufacturers on certain prescription drug products dispensed to Participants by Network Pharmacies. These requirements include, but are not limited to the following: (1) You agree to use our preferred drug list and our pharmacy network. (2) You agree to distribute the drug list to

10

BBA 00446

Participants. (3) You agree to conduct appropriate communication with the Participants, i.e., advising Participants to furnish a copy of the preferred drug list to their physicians. (4) You agree to other reasonable requirements for participation in the rebate program that we may communicate to you from time to time.

We will negotiate with drug manufacturers regarding the terms of the rebate program, and, will arrange for the payment of rebates on certain prescription drug services utilized by Participants. You agree that during the term of this Agreement, neither you nor the Plan will negotiate or arrange or contract in any way for rebates on or the purchase of prescription drugs from any manufacturer. In the event you or the Plan negotiates or arranges with a drug manufacturer for rebates on or the purchase of prescription drugs or services, but without limiting our right to other remedies, we may immediately terminate your and Plan's participation in the rebate program or terminate the pharmacy benefit management services under this Agreement.

We will retain 20% of all rebates received from prescription drug services as part of our reasonable compensation under this Agreement and you will receive the balance.

Upon your request, we will provide you with current information concerning the value of these rebates.

**Income from Drug Manufacturers.** Our subcontractor provides to drug manufacturers certain administrative services, formulary compliance services, computer software, non-confidential data, and/or research services and is paid by the manufacturer for such services, software and non-confidential data. As of the Effective Date, the fees for administrative services are generally three and a half percent (3.5%) of the cost of drugs under rebate contract dispensed to Participants, and the fees for the other services software and non-confidential data are generally based on the number of Participants.

**Mail Order Pharmacy.** We will provide a mail order pharmacy program for Participants including the necessary forms and procedures to obtain such services.

**Section 12.16 Facility Reasonable Charge Determination and Negotiation Reductions.** We will evaluate certain facility-billed charges which may exceed the reasonable charge reimbursable under Plan terms, make payment in accordance with appropriate guidelines, and negotiate with the facility as needed for reduction of billed charges. The additional service charge for this service is described in Exhibit A.

**Termination.** We can terminate the Facility Reasonable Charge program in whole or in part at any time for any reason.

In the event of termination, we can elect to continue such reviews and negotiations that are in progress at the time of such termination. The additional service charge described in Exhibit A will continue to apply.

**Section 12.17 Shared Savings Program.** For the service fee specified in Exhibit A, we may make our Shared Savings Program available to some or all of your Plan, when such discounts are available to us. The program provides access to discounted charges from health care providers which are made available to us for use with the employee benefit plans that we administer on behalf of our customers.

The amount of benefits payable under the portion of the Plan to which the discounts apply will be determined based on the discounted charges under the program. If a Participant is enrolled in a network plan and receives services from a network provider under the terms of that plan, then health benefits payable for services rendered by that provider will be based on the applicable rates for fees for services set forth in our provider agreement with that provider rather than based on the discounts available under the Shared Savings Program. In this case, those benefits will not be included in the calculation of the "Savings Obtained" under the Shared Savings Program and the service fee for the Shared Savings Program will not apply to those benefits.

Listings of providers subject to the discounts under this program will not be provided to you or to Participants. You understand that the services provided under the program are to provide access to provider discounts only. Our services under this program do not include credentialing of providers or other managed care network services.

We can terminate the Shared Savings Program in whole or in part at any time for any reason. You can terminate the program at any time for any reason by giving us written notice. We will implement the termination within a reasonable period of time after receiving the notice.

BBA 00447

**Section 12.18  Optum Management Programs.**  For the service fee specified in Exhibit A, we will provide Participants with access to various publications that are amended from time to time, and Optum NurseLine, a 24-hour service providing general health information and identification of specific health related concerns, and, provision of education information regarding those concerns, by registered nurses by telephone or via an audio health information library.

## Section 13  -  Miscellaneous

**Section 13.1  Subcontractors.**  We can use our affiliates or other subcontractors to perform our services under this Agreement. However, we will be responsible for those services to the same extent that we would have been had we performed those services without the use of an affiliate or subcontractor.

**Section 13.2  Assignment.**  Except as provided in this paragraph, neither party can assign this Agreement or any rights or obligations under this Agreement to anyone without the other party's written consent. That consent shall not be unreasonably withheld. Notwithstanding, we can assign this Agreement, including all of our rights and obligations to our affiliates, to an entity controlling, controlled by, or under common control with us, or a purchaser of all or substantially all of our assets, subject to notice to you of the assignment.

**Section 13.3  Governing Law.**  This Agreement is governed by ERISA and, if applicable, the laws of the State of Connecticut.

**Section 13.4  Entire Agreement.**  This Agreement, with its exhibits, constitutes the entire Agreement between the parties governing the subject matter of this Agreement. This Agreement replaces any prior written or oral communications or agreements between the parties relating to the subject matter of this Agreement. The headings and titles within this Agreement are for convenience only and are not part of the Agreement.

**Section 13.5  Amendment.**  Except as may otherwise be set forth in this Agreement, the Agreement may be amended only by both parties agreeing to the amendment in writing, executed by a duly authorized person of each party.

**Section 13.6  Waiver.**  Nothing in this Agreement is considered to be waived by any party unless the party claiming the waiver receives the waiver in writing. No breach of the Agreement is considered to be waived unless the non-breaching party waives it in writing. A waiver of one provision does not constitute a waiver of any other.

BBA 00448

# EXHIBIT A  -  SERVICE FEES

This exhibit lists the service fees you must pay us for our services during the term of the Agreement. These fees apply for the period from July 1, 2001 to July 1, 2002. You acknowledge that the amounts paid for administrative services are reasonable.

These fees are subject to the adjustments set forth in Exhibit B or Exhibit C.

**Administrative Fees**

- $27.75 per month per Employee covered under the "United HealthCare Options PPO with Differential" portion of the Plan.

- $26.15 per month per Employee covered under the "United HealthCare Options PPO without Differential" portion of the Plan.

- $32.59 per month per Employee covered under the "United HealthCare Choice" portion of the Plan.

**Service Fee for Facility Reasonable Charge Determination and Negotiation**

You will pay a fee for our services, as described in Section 12, equal to thirty percent (30%) of the amount of reductions obtained through our efforts.

We will bill you for the amounts that you owe us. The bill will reflect reductions obtained during the preceding month and adjustments, if any, from previous months.

**Service Fee for Shared Savings Program**

You will pay a fee equal to thirty-five percent (35%) of the "Savings Obtained" as a result of the Shared Savings Program described in Section 12. "Savings Obtained" means the amount that would have been payable to a health care provider, including amounts payable by both the Participant and the Plan, if no discount were available, minus the amount that is payable to the health care provider, again, including amounts payable by both the Participant and the Plan, after the discount is taken.

BBA 00449

10-; 3-03; c;44PM;Contract Pay Account                    ;860 702 7836        # 17/ 22

# EXHIBIT B  -  PERFORMANCE STANDARDS FOR HEALTH BENEFITS

## Adjustment to Standard Service Fees

The service fees payable by you for the services provided under this Agreement will be adjusted in accordance with the performance standards set forth in this Exhibit. Unless otherwise specified, these standards are effective for the period beginning July 1, 2001 and ending on June 30, 2002, the "Guarantee Period". With respect to the aspects of our performance addressed in this Exhibit, these fee adjustments are your exclusive financial remedies.

## Claim Operations Performance Standards

For the following "Claim Operations Performance Guarantees", the term "claim" shall mean a written request for payment of a Plan benefit made by a member or provider.

### Time to Pay

We will complete processing of ninety percent (90%) of all claims we receive within 10 business days of receipt, as evidenced by our date stamp. Timeliness will be measured using the "Time to Pay" report produced by us on a monthly basis. The overall performance period result is recalculated using the raw data for the period. The "Time to Pay" results are always rounded to the nearest whole percent.

Time to Pay will be measured based upon the agreed upon measurement criteria. For this Agreement, the criteria will be based upon the results of the team servicing your account.

A claim will be considered processed when the claim has been completely reviewed and a payment determination has been made.

Time to pay is measured the same way regardless of the timing of our responses to a claimant.

Failure to maintain a ninety percent (90%) score for the Guarantee Period will result in a credit to the service fees for health benefits in the Agreement Period following the Guarantee Period. The maximum amount of the credit will be $12,500. Credits against this performance measure will be applied on a gradient as follows:

  90% within 11 business days

  90% within 12 business days

  90% within 13 business days

  90% within 14 business days

  90% within 15 or more business days

### Financial Accuracy

We will maintain a Financial Accuracy rate of not less than ninety-nine percent (99%) for the Guarantee Period. Financial Accuracy is measured by collecting a statistically significant random sample of claims processed. The sample is reviewed to determine the percentage of claim dollars processed correctly out of the total claim dollars submitted for payment. The measurement will be done by our standard internal quality assurance program based on a periodic audit of all claims processed by the team servicing your account. The overall performance period result is recalculated using the raw data for the period.

Failure to maintain a ninety-nine percent (99%) score for the Guarantee Period will result in a credit to the service fees for health benefits in the Agreement Period following the Guarantee Period. The maximum amount of the credit will be $12,500. Credits against this performance measure will be applied on a gradient as follows:

  98.99% - 98.76% paid correctly

  98.75% - 98.50% paid correctly

  98.49% - 98.25% paid correctly

  98.24% - 98.00% paid correctly

14

**BBA 00450**

Below 98.00% paid correctly

**Procedural Accuracy**

We will maintain a Procedural Accuracy rate of not less than ninety-five (95%) for the Guarantee Period. Procedural Accuracy is measured by collecting a statistically significant random sample of claims processed by the offices servicing your account. The sample is reviewed to determine the percentage of claims processed without non-financial errors.

The measurement will be done by our standard internal quality assurance program based on a periodic audit of all claims processed by the Team servicing your account. The overall performance period result is recalculated using the raw data for the period.

Failure to maintain a ninety-five percent (95%) score for the Guarantee Period will result in a credit to the service fee for health benefits in the Agreement Period following the Guarantee Period. The maximum amount of the credit will be $12,500. Credits against this performance measure will be applied on a gradient as follows:

94.99% - 94.50% paid correctly

94.49% - 94.00% paid correctly

93.99% - 93.50% paid correctly

93.49% - 93.00% paid correctly

Below 93% paid correctly

**Items Excluded From Claim Operations Performance Measurements**

With some products (e.g. HMO), financial reimbursement arrangements are contractually negotiated with providers (physicians, labs, etc.), which budget the payment they receive for certain services. Periodic payments are made to the providers in return for their agreement to provide the negotiated services to network members. Services provided under these arrangements are not processed as a typical "claim" and, as a result, results from the networks featuring these arrangements are not included in the performance statistics outlined above.

The claims that are included in Claim Operations performance categories are limited to medical claims processed through the UNET claims system(s). Claims processed through any other system, including claims for other products such as vision, dental, or pharmacy coverage, are not included in the calculation of the performance measurements stated above.

## Provider Networks Performance Standards

**Inpatient, Outpatient & Physician Network Discounts**

The percent of discount from covered Billed Charges (calculated as the difference between covered charges submitted by the network provider and the amount based on the negotiated rate with that provider. No reasonable and customary R&C) reductions are taken when negotiated rate is in place with a network provider. The calculation is performed before the application of co-payments, deductibles, or other coinsurance.

Amount at Risk Dollar amount is $62,500.00.

| Network Discounts | Expected Average Discount | Weighting Toward Composite |
|---|---|---|
| 1) Inpatient | 51.3% | 30.0% |
| 2) Outpatient | 51.2% | 24.0% |
| 3) Physician | 30.84% | 46.0% |

BBA 00451

| Combined Average Discount | 41.86% |
| --- | --- |
| In Network Discounts realized by Dallas Airmotive employees residing in the Dallas market area are within 8% of average composite Network Discounts. | |

## Member Phone Service Performance Standards

### Average Speed to Answer

This standard applies to the claim office(s) and/or the member service office(s) which provide service for your employees. We will guarantee that calls will sequence through our automated telephone call distribution system and be answered by a customer service representative in 30 seconds or less, on average. The Average Speed to Answer will be measured by the standard tracking reports produced by our automated phone system for all calls handled by the Team servicing your account.

If the Average Speed to Answer for the Guarantee Period is greater than 30 seconds, on average, a credit to the service fees for health benefits will be made in the Agreement Period following the Guarantee Period. The maximum amount of the credit will be $12,500. Credits against this performance measure will be applied on a gradient as follows:

    32 seconds or less

    34 seconds or less

    36 seconds or less

    38 seconds or less

    Greater than 38 seconds to answer

### Abandonment Rate

This standard applies to the claim office(s) and/or the member services office(s) which provide service for your employees. We will guarantee that calls will sequence through our automated telephone call distribution system such that the average abandonment rate will be no greater than 5 percent. The Abandonment Rate results will be measured by the standard tracking reports produced by our automated phone system for all calls handled by the Team servicing your account.

If the Abandonment Rate for the Guarantee Period is greater than five percent (5%) on average, for all locations providing member phone service to your employees, a credit to the service fee for health benefits will be made in the Agreement Period following the Guarantee Period. The maximum amount of the credit will be $12,500. Credits against this performance measure will be applied on a gradient as follows:

    5.01% - 5.50% of calls abandoned

    5.51% - 6.0% of calls abandoned

    6.01% - 6.50% of calls abandoned

    6.51% -7.00% of calls abandoned

    Greater than 7.00% of calls abandoned

### Call Quality Score

We will maintain a Call Quality Score of not less than ninety percent (90%) for the Guarantee Period. Call Quality is measured by collecting a random sample of member calls answered by the office(s) servicing your account. The sample is reviewed to determine the percentage of customer service quality points earned based on the total points available. The measurement will be done by our standard internal call quality assurance program. The overall performance period result is recalculated using the raw data for the period.

The sample will be based on all calls answered by the Team servicing your account during the Guarantee Period.

BBA 00452

If the Call Quality Score for the Guarantee Period is less than ninety percent (90%), a credit to the service fees for health benefits will be made in the Agreement Period following the Guarantee Period. The maximum amount of the credit will be $12,500. Credits against this performance will be applied on a gradient as follows:

88.00% - 89.00% score

86.00% - 87.00% score

84.00% - 85.00% score

82.00% - 83.00% score

Below 82% score

## Member Satisfaction Performance Standard

### Overall Satisfaction

This standard applies to the member services offices that provide POS, EPO, PPO, Managed Indemnity and/or Managed Medicare Services for your employees. We will conduct, on an annual basis, a Uniprise Customer Satisfaction Survey. The Overall Satisfaction question reads:

"Overall, how satisfied are you with the way we administer your medical health insurance plan, such as processing your claim or helping answer any questions or resolving any problems you may have?"

If less than 80% of the respondents, based on the average results for all centers providing services for your employees, are satisfied overall (i.e. if members do not respond with either completely satisfied, very satisfied or somewhat satisfied), a credit to the service fee for health benefits will be made in the Agreement Period following the Guarantee Period. The amount of the credit will be $12,500.

### Middle Market Customer Scorecard Survey

This standard applies to Employee Benefits Managers/Administrators for services we provide them. We will conduct, on an annual basis, a Middle Market Customer Scorecard Survey. The overall satisfaction question used reads: "Overall, how satisfied are you with your relationship with United Healthcare?"

If response is completely, very or somewhat satisfied, the guarantee has been met. If not, the amount of the credit will be $12,500.

## Change in Reporting Format

We reserve the right from time to time to replace any report or change the format of any report referenced in these standards. In such event, the standard will be modified to the degree necessary to carry out the intent of the parties.

## Non-Performance

We shall not be required to meet any of the performance standards provided for in this Exhibit to the extent we fail to meet these standards due to fire, embargo, strike, war, accident, act of god, voluntary or involuntary compliance with any valid or invalid law or regulation of any governmental agency or authority or anything beyond our reasonable control.

**Total amount at risk is $162,500.**

BBA 00453

# EXHIBIT C  -  THIRD PARTY DISCLOSURE AGREEMENT

This THIRD PARTY DISCLOSURE AGREEMENT ("Agreement") is entered into by and between BBA Aviation Benefit Plan ("Employer"), [Examiner Name] ("Examiner") and United HealthCare Insurance Company for itself and its affiliated companies ("United HealthCare"). These parties acknowledge and agree as follows:

Employer and United HealthCare entered into an agreement ("the Agreement") under which United HealthCare provides claims administration and other services for Employer's employee welfare benefit plan ("Plan"). Employer has retained Examiner to perform an examination, audit or other evaluation of the files, books, and/or records of United HealthCare pertaining to the Plan ("Examination").

Employer has requested that solely for purposes of the Examination, United HealthCare disclose to Examiner certain documents, statistical information and other information which is commercially valuable, confidential, proprietary, or trade secret ("Proprietary Information") and also materials which may contain medical or other individually identifiable information ("Confidential Medical Information"). Proprietary Information and Confidential Medical Information shall collectively be referred to in this Agreement as "Confidential Information". United HealthCare has agreed to disclose this Confidential Information subject to the terms of this Agreement.

The Examination shall take place on the date or date(s) mutually agreed upon by the parties.

Confidential Information disclosed by United HealthCare, its agents, subsidiaries and affiliates, to Examiner in connection with the Examination, including all copies thereof, shall be used by Examiner only as permitted by this Agreement. Confidential Information shall not include information: (i) generally available to the public or generally known in the insurance industry or employee benefit consulting community prior to or during the time of the Examination through authorized disclosure; (ii) obtained from a third party who is under no obligation to United HealthCare not to disclose such information; or (iii) required to be disclosed by subpoena, or other legal process.

Use: Examiner shall: (a) not use (deemed to include, but not be limited to, using, exploiting, duplicating, recreating, modifying, decompiling, disassembling, reverse engineering, translating, creating derivative works or disclosing Confidential Information to another person or permitting any other person to do so) Confidential Information except for purposes of the Examination; (b) limit use of Confidential Information only to its authorized employees (deemed to include employees as well as individuals who are agents or independent contractors of Examiner) who have a need to know for purposes of the Examination; and (c) may release Confidential Information in response to a subpoena or other legal process to disclose Confidential Information, after giving United HealthCare reasonable prior notice of such disclosure.

At the conclusion of the Examination, Examiner shall either relinquish to United HealthCare, or destroy (with such destruction to be certified to United HealthCare), all Confidential Information. If during the course of the Examination it is discovered that this Agreement has been breached by Examiner then all Confidential Information shall be relinquished to United HealthCare upon demand.

This Agreement binds the parties and their respective successors, assigns, agents, employers, subsidiaries and affiliates.

Unauthorized use of Confidential Information by Examiner is a material breach of this Agreement resulting in irreparable harm to United HealthCare for which the payment of money damages is inadequate. It is agreed that United HealthCare, upon adequate proof of unauthorized use, and in addition to any other remedies at law or in equity that it may have, may immediately obtain injunctive relief in any court of competent jurisdiction enjoining any continuing or further breaches and may obtain entry of judgment for injunctive relief. Examiner consents to said injunctive relief and judgment. Employer and Examiner agree to indemnify and hold harmless United HealthCare with respect to any claims and any damages caused by Examiner's breach of this Agreement.

The requirement to treat all Confidential Medical Information, as Confidential Information shall survive the termination of this Agreement. The requirement to treat all Proprietary Information as Confidential Information under this Agreement shall remain in full force and effect so long as any Proprietary Information remains commercially valuable, confidential, proprietary and/or trade secret, but in no event less than a period of three (3) years from the date of the Examination.

18

**BBA 00454**

Neither this Agreement nor Examiner's rights or obligations hereunder may be assigned without United HealthCare's prior written approval.

**General:** (a) This Agreement is the entire understanding between the parties as to the subject matter hereof. (b) No modification to this Agreement shall be binding upon the parties unless evidenced in writing signed by the party against whom enforcement is sought. (c) Headings in this Agreement shall not be used to interpret or construe its provisions. (d) The alleged invalidity of any term shall not affect the validity of any other terms. (d) This Agreement may be executed in counterparts.

The parties have caused their authorized representatives to execute this Agreement.


**BBA Aviation Benefit Plan**

By_____
          Authorized Signature

Print Name _____

Print Title _____

Date_____


**[Examiner Name]**

By_____
          Authorized Signature

Print Name _____

Print Title _____

Date_____


**United HealthCare Insurance Company**

By_____
          Authorized Signature

Print Name _____

Print Title _____

Date_____


03710586 (01/02)

BBA 00455